UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

EAST KENTUCKY POWER
COOPERATIVE, INC.
        Plaintiff

v.                                                    Civil Action No. 3:22-CV-00063-GVFT

KENTUCKY PUBLIC SERVICE
COMMISSION
        Defendant

---

## DEFENDANT'S MOTION TO DISMISS

---

Defendant Kentucky Public Service Commission, by counsel, hereby moves this Court, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), to dismiss the Petition for Declaratory and Injunctive Relief filed by East Kentucky Power Cooperative, Inc. As grounds for its motion, Defendant states that (1) this action is barred by the Eleventh Amendment to the United States Constitution; (2) this Court lacks subject matter jurisdiction because the Petition raises as-applied challenges to state regulatory adjudications, which must be brought in state courts; and (3) Plaintiff present no claims upon relief may be based because Plaintiff has presented no actual case or controversy.

# I.    BACKGROUND

This case concerns East Kentucky Power Cooperative, Inc.'s ("EKPC") claims that Kentucky Public Service Commission ("PSC") regulations and orders are contrary to the requirements of the Public Utility and Regulatory Policies Act of 1978, as amended ("PURPA").  EKPC brings this action solely against the PSC pursuant to PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B).

## A.    PURPA and the Federal Energy Regulatory Commission ("FERC") Rules

Congress enacted PURPA in 1978 in response to the energy crisis of the 1970s, intending to promote energy conservation.  As part of this drive to further energy conservation and efficiency, PURPA was also passed to promote the development of cogeneration and small power production facilities ("qualifying facilities" or "QFs"), which provided a benefit to consumers through an increase in the diversity of energy resources.  Congress recognized two major obstacles to QF development.  *See FERC v. Mississippi*, 456 U.S. 742, 750-51 (1982).  First, Congress recognized that utilities were reluctant to engage with QFs and buy power from them. *Id*. Second, QFs were reluctant to take on the financial burden of traditional utility regulation. *Id*.

PURPA Section 210(a), 16 U.S.C. § 824a-3(a), directed the FERC to promulgate rules requiring electric utilities to purchase energy from QFs, as the FERC deemed necessary to "encourage cogeneration and small power production."  Section 210(b) of PURPA, 16 U.S.C. § 824a-3(b), provided that the rules promulgated by the FERC ensure that the rates for power purchases from a QF be "just and reasonable" to the electric consumers of the electric utility, and "not to exceed the cost—called in the

statute the 'incremental cost of alternative electric energy'—the utility would incur in generating the electricity itself or in purchasing it from a non-QF generator." *North American Nat. Resources, Inc. v. Strand*, 252 F.3d 808, 810 (6th Cir. 2001). This is known as the utility's "avoided cost."

Under PURPA's implementation scheme, section 210(f), 16 U.S.C § 824a-3(f), directed each state regulatory authority to implement the FERC's section 210(a) rules for each electric utility over which it had ratemaking authority. In 1980, the FERC promulgated PURPA rules for state regulatory authorities to implement section 210(a) rules. Those rules provide that utilities must purchase QF power at a rate equal to the utility's avoided cost. 18 C.F.R. §§ 292.101(b)(6) and 292.304(b)(2).

PURPA § 210 was intended "to increase the utilization of cogeneration and small power." *American Paper Institute, Inc. v. American Elec. Power Service Corp.*, 461 U.S. 402, 417 (1983) (*citing FERC v. Mississippi*, 456 U.S. at 750–751). In a case challenging the FERC's usage of the full-avoided-cost rate under § 210(b) of PURPA, the Supreme Court held that the FERC was justified in prescribing such a rate as it would provide the maximum incentive for the development of cogeneration and small power production as envisioned under PURPA. *American Paper Institute, Inc.,* 461 U.S. at 412-418.

PURPA *does not* require that a state public utilities commission, such as the PSC, adopt a specific rate or rate scheme. The state commission may implement PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by adopting any other means that reasonably give effect to FERC's regulations." *FERC*

*v. Mississippi*, 456 U.S. at 749–51.  Likewise, the FERC's regulations afford state commissions a "wide degree of latitude" in determining how to implement PURPA. *Cal. Pub. Util. Comm'n*, 133 FERC ¶ 61,059, at ¶ 24 (2010).  As long as an implementation plan is consistent with federal law, the FERC does not "second-guess" the state commission.  *Id.*

## B.    The PSC and PSC Regulation

The PSC is the state agency that regulates public utilities in Kentucky. Kentucky Revised Statues ("KRS") Chapter 278.  EKPC is a member owned electric generator that provides wholesale electricity to its 16 member-owner rural electric distribution cooperative corporations ("RECCs").

## C.    Plaintiff's Proceedings Before the PSC

On March 22, 2021, EKPC and its 16 member-owner RECCs filed with the PSC revised tariff sheets setting forth rates for the purchase of electric energy and capacity from QFs.  On May 24, 2022, pursuant to KRS 278.190, the PSC established a proceeding to investigate the reasonableness of the proposed tariff rates, and suspended the proposed rates for five months, until October 31, 2021, in PSC Case No. 2021-00198, *Electronic Tariff Filing Of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*.

Of significance to the instant proceeding and the proceeding before the PSC, in 2013, EKPC joined PJM Interconnection, Inc. ("PJM"), a regional transmission organization ("RTO").  PJM operates an energy and capacity market which

encompasses 13 states and the District of Columbia, in which EKPC participates.  As a Self-Supply participant in PJM's capacity market, officially called the Reliability Pricing Model ("RPM"), as well as being a Load Serving Entity, EKPC must commit the entirety of its generation resources into the capacity market.  The Base Residual Auction ("BRA") is the primary capacity market auction, usually run annually on a three year forward basis, e.g., the BRA for the 2020/21 Delivery Year was run in May 2017.  EKPC must commit its generation resources into the BRA, and pay the resulting market clearing price to purchase its administratively determined demand back. If EKPC's generation resources clear the auction such that it has a surplus of capacity in excess of its native load obligation, EKPC is paid for that surplus capacity at the market clearing price.  If EKPC's generation resources do not all clear the market and it has a capacity shortfall below its native load obligation, it must purchase the required capacity from the market at the market clearing price.

Because the BRA is conducted three years forward, PJM also conducts three Incremental Auctions which are successively closer in time to the delivery year. These incremental auctions allow for replacement resource procurement, procurement of extra resources, or for the sale of excess resources as necessary to correspond with an LSE's most current reliability requirements.

Regardless of EKPC's PSC-approved participation in PJM and its related markets, the PSC's regulation of EKPC has not changed since it joined PJM. EKPC's obligations under Kentucky law are exactly the same as they were before it was permitted to become a member and fully participate in PJM.

In the final order of Case No. 2021-00198, the PSC found that the PJM BRA capacity market-clearing price was the most accurate interim proxy to determine EKPC's avoided capacity costs and ordered EKPC to use it until EKPC files its next annual COGEN/SPP tariff filing update. *See* Ex. A. Noting EKPC's obligations under Kentucky law and its expectation EKPC would have enough power owned or contracted to serve the retail demand of EKPC's 16 member-owners, the PSC expressed a preference for EKPC to use a unit cost or bilateral contract cost as the basis for determining EKPC's avoided capacity costs, as the PSC explained its interest in ensuring EKPC does not meet its native capacity demand through competitive market products. EKPC advocated for a market-clearing price as the most appropriate measure for determining its avoided capacity rate, but preferred the market-clearing price for the third incremental auction instead of the base auction, reasoning that it was more accurate since it was the closest auction in time to the delivery year. The PSC explained that this was inappropriate because the BRA is where EKPC must commit its generation resources and purchase an amount equal to its required load back, which is a much better proxy for its avoided cost. The PSC opined that it expected EKPC to use future tariff filings to develop a more robust record including the most recent BRA results, EKPC's actual cost for a unit of physical capacity, whether purchased or built, and information regarding the capacity contribution of non-dispatchable resources, upon which the PSC could make findings and best determine the most appropriate proxy for EKPC's avoided capacity

cost rate going forward.  The PSC subsequently denied EKPC's request for rehearing on this issue.  *See* Ex. B.

**D.    Plaintiff's Proceedings Before the FERC.**

On April 8, 2022, nearly 130 days after the PSC denied EKPC's motion for rehearing, EKPC filed a petition with the FERC ("FERC Petition").  *See* Ex. C.  EKPC alleged that the PSC has:

> [*C*]*onsistently failed to implement* PURPA's requirement, as set forth in the Commission's PURPA regulations, that the price to be paid by an electric utility to QFs for power purchased from the QFs not exceed the incremental cost to the electric utility of power that it otherwise would generate or purchase itself (i.e., the electric utility's "avoided cost").

FERC Petition at 9.

EKPC alleged (in allegations notably absent from its current petition) that the PSC had erroneously set the avoided capacity costs not just for EKPC, but for three other electric utilities: Kentucky Power Company; Louisville, Gas and Electric Company; and Kentucky Utilities Company.  In response, the PSC ably proved that it had properly implemented PURPA in determining capacity costs for these utilities and EKPC.  *See* Ex. D.  Ultimately, the FERC issued a notice declining to initiate an enforcement action against the PSC.  *See* Ex. E.

## II.    APPLICABLE STANDARDS

**Standard for a motion to dismiss**.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted where the Court lacks subject matter jurisdiction over the subject of the action based upon the PSC's Eleventh Amendment immunity and PURPA's

requirements that an "as applied" challenge be brought in state court. (PURPA section 210(g) (16 U.S.C. § 824a)). *See Valentin v. Hospital Bella Vista,* 254 F.3d 358, 362–63 (1st Cir. 2001) (Rule 12(b)(1) "is a large umbrella, overspreading variety of different types of challenges to subject-matter jurisdiction. Some challenges—those grounded in considerations of ripeness, mootness, sovereign immunity, and the existence of federal question jurisdiction are good examples.")

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted where the plaintiff fails to state a claim upon which relief can be granted. The applicable question is whether EKPC's well-pleaded allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). They do not.

## III.    ARGUMENT

### A.    Plaintiff's Action Is Barred by the Eleventh Amendment

The Eleventh Amendment "implicates the fundamental constitutional balance between the Federal Government and the States." *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 (1985). Consequently, the Amendment affirms that the "'fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III' of the Constitution." *Id.*, *quoting Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98 (1984).

There are only two exceptions to the Eleventh Amendment bar against lawsuits brought by private parties against states in federal court: (1) when the state has expressly consented to be sued in federal court, *Hans v. Louisiana,* 134 U.S. 1, 13

(1890) ("It is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent") and (2) when Congress explicitly abrogates the state's immunity in the text of a statute enacted pursuant to a constitutional provision that confers power to abrogate, e.g., the Fourteenth Amendment to the United States Constitution. *Dellmuth v. Muth*, 491 U.S. 223, 227 - 228, (1989). *See also Atascadero*, 473 U.S. 238-240 (discussing stringent conditions for finding that one of these two exceptions to the Eleventh Amendment immunity applies, and finding lack of explicit statement of Congressional intent to abrogate). Neither exception applies here.

The PSC, as a state agency, shares Kentucky's Eleventh Amendment immunity. The Eleventh Amendment "prohibits federal courts from entertaining suits by private parties against States and their agencies." *Alabama v. Pugh*, 438 U.S. 781, 781, (1978). *See also, Pennhurst*, 465 U.S. 89, 100 ("It is clear, of course, that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment"); *Martin v. University of Louisville*, 541 F.2d 1171, 1174 (6th Cir. 1976) (as a "state institution," the University of Louisville possessed Eleventh Amendment immunity.) The PSC is an arm of the Commonwealth, an administrative agency organized under the provisions of KRS Chapter 278, and, for administrative purposes, part of Kentucky's Energy and Environment Cabinet. KRS 12.020. State utility commissions, such as the PSC, have been deemed to be entitled to Eleventh Amendment immunity for suits brought under PURPA. *See North American Nat.*

*Resources, Inc. v. Michigan Public Service Com'n,* 41 F. Supp. 2d 736, 741 (W.D. Mich. 1998*), vacated on other grounds in North American Nat. Resources, Inc. v. Strand,* 252 F.3d 808 (6th Cir. 2001) ("The MPSC is a state agency that is entitled to the immunity afforded the state under the Eleventh Amendment.").

### 1. Congress Has Not Abrogated the PSC's Eleventh Amendment Immunity

PURPA was enacted pursuant to the Interstate Commerce Clause, U.S. Const. Art. 1, Section 8, Cl. 3. *See, FERC v. Mississippi,* 456 U.S. at 758 (The enactment of PURPA was "within Congress' power under the Commerce Clause.") The Supreme Court has explicitly held that that the Interstate Commerce Clause does not empower Congress to abrogate a state's Eleventh Amendment immunity. *Seminole Tribe of Florida v. Florida,* 517 U.S. 44 (1996). In *Seminole,* the Supreme Court explained that, in order to determine whether Congress has abrogated a state's immunity, a court must ask two questions: (1) whether Congress has unequivocally expressed its intent to abrogate; and (2) whether Congress has acted pursuant to a valid exercise of power. *Id.* at 55. The Court need not answer the former, as the answer to the latter is no: Congress lacked the power to abrogate the state's immunity in PURPA pursuant to its Article I powers. "Eleventh Amendment Immunity may not be lifted by Congress unilaterally deciding that it will be replaced by grant of some other authority." *Id.* at 58–59. *Seminole* expressly rejected the Supreme Court's prior decision in *Pennsylvania v. Union Gas Co.*, 491 U.S. 1. 19-20 (1989) which held that the Interstate Commerce Clause gave Congress the power to abrogate Eleventh Amendment immunity.

## 2.     The PSC Has Not Waived Its Eleventh Amendment Immunity

A state abrogates its Eleventh Amendment immunity only if it unequivocally consents to be sued in *federal* court. *Atascadero*, 473 U.S. at 179. There has been no such express waiver by the Kentucky General Assembly. KRS 278.410 provides only that the PSC may be sued in Franklin Circuit Court in Kentucky. It cannot be construed to abrogate Kentucky's Eleventh Amendment immunity. *See Martin v. University of Louisville*, 541 F.2d 1171, 1174-76 (6th Cir. 1976) (corporate status, together with statutory language providing the university could "sue and be sued," did not constitute the university's being sued in *federal* court).

Kentucky has not explicitly consented to suit in federal court. A waiver of a constitutional right such as Kentucky's Eleventh Amendment immunity must be knowing and intelligent, based on unequivocal knowledge that the right in question is surrendered by the action taken. As the Supreme Court put it:

> Constructive consent is not a doctrine commonly associated with the surrender of constitutional rights, and we see no place for it here. In deciding whether a State has waived its constitutional protection under the Eleventh Amendment, we will find waiver only where stated "by the most express language or by such overwhelming implications from the text as (will) leave no room for any other reasonable construction."

*Edelman v. Jordan*, 415 U.S. 651, 673 (1974) *quoting Murray v. Wilson Distilling Co.*, 213 U.S. 151, 171 (1909).

Moreover, the PSC cannot be held reasonably to have "chosen" to waive Kentucky's Eleventh Amendment immunity to establish avoided cost rates for QFs pursuant to PURPA. Participation in the PURPA statutory scheme is not sufficient to waiver immunity of "consent" to a suit in federal court. *See Florida Dep't of Health*

*and Rehabilitative Servs. v. Florida Nursing Home Assoc.,* 450 U.S. 147, 150 (1981) (state's participation in federal Medicaid program through which federal government provides assistance for operation by state of system of public aid and agreement to abide by federal law in doing so is not sufficient to establish consent on part of state to be sued in federal courts); *New York State Elec. & Gas Corp. v. Saranac Power Partners L.P.,* 117 F. Supp. 2d 211, 250 (N.D.N.Y. 2000), *aff'd*, 267 F.3d 128 (2d Cir. 2001) (rejecting the argument that the New York public service commission's implementation of PURPA constituted a waiver of Eleventh Amendment immunity). The PSC's promulgation of regulations and issuances of orders implementing the requirements of PURPA does not constitute a waiver of its Eleventh Amendment immunity.

The PSC has not waived its Eleventh Amendment immunity, and Congress did not (and cannot) abrogate the PSC's Eleventh Amendment immunity. The Court does not have jurisdiction over the PSC and does not have subject matter jurisdiction over EKPC's petition. EKPC's action, therefore, is barred by the Eleventh Amendment and must be dismissed for lack of subject matter jurisdiction.

## B.  The Court Lacks Subject Matter Jurisdiction over the Petition

The Court does not have subject matter jurisdiction over Plaintiff's Petition because the Petition brings "as-applied" claims that federal law require plaintiffs to raise in state courts.

PURPA allocates jurisdiction between federal district courts (PURPA section 210(h)(2) (16 U.S.C. § 824a-3(h)(2)), and state courts (PURPA section 210(g) (16

U.S.C. § 824a)).   Challenges to a state regulatory commission's application of its

PURPA implementation rules made pursuant to PURPA section 210(g) – "as-applied"

claims – must be brought in the state's appellate courts, through the state appellate

processes generally available for review of that regulatory commission's

determinations. *Portland Gen. Elec. Co. v. FERC*, 854 F.3d 692, 698 (D.C. Cir 2017)

("State-based adjudication serves as the mainstay for enforcing PURPA rights.

PURPA section 210(g)…permits 'any person' to 'bring an action against any electric

utility [or] qualifying small power producer…to enforce any requirement' created by

a state's implementation of PURPA…Reflecting Congress's judgment that 'federal

rights granted by PURPA can appropriately be enforced through state adjudicatory

machinery,'…the statute channels actions under this subsection into 'the appropriate

State court,'") (citations omitted); *See Exelon Wind I, LLC v. Nelson*, 766 F.3d 380,

388 (5th Cir. 2014) ("PURPA provides for two types of review of a state utility

regulatory authority's actions: implementation and as-applied challenges. . . . Federal

courts have exclusive jurisdiction over implementation challenges, while state courts

have exclusive jurisdiction over as-applied challenges"); *Pwr. Res. Grp. v. Pub. Utils.

Comm'n of Texas*, 422 F.3d 231, 235 (5th Cir. 2005) ("Federal courts may not hear 'as

applied' claims, because jurisdiction over such claims is reserved to the state courts").

EKPC's petition is an "as applied" challenge because it applies solely to EKPC.

*See Exelon Wind 1,* 766 F.3d at 390–91 (wherein the Fifth Circuit held that Exelon's

challenges to an order of the Public Utility Commission of Texas were as-applied

challenges since it was found that the order applied PUC Rule 25.242 to an individual

petitioner—Exelon—stating that the possibility that the challenges "may establish precedent relevant to future cases does not transform them into facial or implementation challenges" and accordingly vacated the decision of the district court and dismissed these challenges for lack of subject matter jurisdiction in federal court. The Fifth Circuit held that the district court did have subject matter jurisdiction to hear Exelon's claim that PUC Rule 25.242 failed to implement FERC's Regulation regarding PURPA.) EKPC has not, and cannot, prove that the relief that it seeks applies to any other utility in Kentucky other than itself.

EKPC recounts its membership in PJM and its participation in the BRA in support of its petition as grounds for why the Court should exercise jurisdiction and usurp the PSC's traditional role of rate regulation of EKPC. Yet EKPC is the only utility in Kentucky that participates in the BRA at PJM. Thus, the requested relief, particularly in paragraph 3[1] of the prayer for relief in EKPC's petition, would apply only to EKPC.

The relief requested in paragraphs 1[2] and 2[3] of the prayer for relief is also unique to EKPC, because determining when or if a utility has excess capacity in the

[1] Requesting that the Court declare "under PURPA Section 210(b) that the market-clearing price in an organized capacity market auction in which an electric utility acquires capacity to meet its load-serving obligations, or to replace capacity resource commitments if it had sufficient owned and/or contracted resources to meet its load-serving obligations, may be an appropriate measure of the electric utility's incremental cost of capacity." [Petition at 15].

[2] Requesting that the Court declare "under PURPA Section 210(a) that when an electric utility has electric capacity, whether owned and/or contracted for in an amount that meets or exceeds its load requirements, the utility may not be required to pay more than $0 for electric capacity purchased from QFs." [Petition at 14].

[3] Requesting that the Court declare "under PURPA Section 210(b) that an electric utility's avoided cost rate for capacity be determined by reference to capacity that is or will be purchased by the electric utility. . ." [Petition at 15].

first place, or what type of capacity is required (e.g., purchased or constructed) is a factual determination that a state makes, not a federal court or the utility.

Kentucky is a vertically integrated, non-restructured state, wherein the PSC ensures that its jurisdictional utilities have sufficient resource adequacy. The Federal Power Act leaves to states jurisdiction over decisions regarding generation: certificates of public convenience and necessity, adequacy investigations, and integrated resource planning. *See generally* 16 U.S.C.A. § 824(b)(1). Neither the PSC nor the Commonwealth of Kentucky has relinquished its role in ensuring resource adequacy to an RTO as has been done in other jurisdictions within PJM. Therefore, it is the PSC that determines not only if a utility has excess capacity but what type of capacity (purchased, contracted, constructed, etc.) meets a utility's capacity needs.

The PSC has consistently declined to allow Kentucky utilities to rely on the various capacity markets for resource adequacy. EKPC knows this, but is asking the Court to ignore that fact. In the final administrative order forming the basis for EKPC's petition, the PSC opined:

> This Commission has no interest in allowing our regulated, vertically-integrated utilities to effectively depend on the market for generation or capacity for any sustained period of time. Thus, should a capacity deficit occur, or is anticipated to occur, it is the replacement capacity cost of the next unit built, or the cost of firm bilateral capacity that should form the basis for avoided capacity values, not a market clearing price. If the Commission does not expect to allow a utility to depend on market-purchases for its long-term capacity needs, it follows that market capacity is not the cost the utility is avoiding. Rather, the likelihood is that the utility will replace generation capacity with "steel in the ground" or a Purchase Power Agreement.

*In the Matter of: Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*, 2021-00198, 2021 WL 5052843, at *3 (Oct. 26, 2021).

If the Court exercises jurisdiction over EKPC's petition, and grants the requested relief, the Court will effectively allow EKPC to determine when and if it has "excess capacity." Such a determination is a *fact specific* inquiry for each utility, affecting each utility differently and thus, any challenge to that determination is an "as applied" challenge and outside of the Court's subject matter jurisdiction. *See Exelon Wind 1,* 766 F.3d at 390–91.

EKPC fails to acknowledge not only that determining when a utility has excess capacity is a fact and utility-specific finding, but also that the PSC has implemented, by Order, rules that upon a fact specific determination from the PSC, would relieve the utility from having to make capacity payments. A state commission may implement PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by adopting any other means that reasonably give effect to FERC's regulations." *FERC v. Mississippi*, 456 U.S. at 749–51. The PSC did so in its 1984 Order implementing PURPA requirements which held that:

> The commission views the calculation or determination of capacity purchase rates as consisting of three separate steps. The first step is the determination of the conditions under which the electric utilities would be required to make a capacity payment to QFs. The commission is of the opinion that capacity payments are appropriate in most circumstances if the QF meets the reliability and dispatchability criteria which a utility would use for its own generation plant. *There are unique conditions on a utility's system which may obviate the necessity for*

*capacity payments.* If a utility demonstrates to the commission's satisfaction that it simultaneously faces insignificant load growth, excess capacity, minimum off system sales and is neither planning nor constructing capacity within its ten-year planning horizon then the utility cannot avoid capacity-related costs at that time so a capacity payment would not be justified. However, the commission emphasizes that it would be contradictory for utilities to argue for zero avoided capacity costs while proceeding to plan for or construct generating facilities. *The burden is on the utility to demonstrate zero avoided capacity costs.*

PSC Case No. 8566, *Re Small Power Producers and Cogenerators*, 60 P.U.R.4th 574, 577–78 (June 28, 1984). (1984 WL 1022161). (Emphasis added).

The PSC's orders and regulations implementing PURPA require a fact and utility specific inquiry and determination for situations that would "obviate the necessity for capacity payments." Whether a utility has a defined capacity need can only be made through a finding by the PSC—a utility cannot determine this on its own. Each utility has the burden to prove that the conditions of its system, i.e., the amount and nature of capacity, would not allow for the avoidance of capacity costs in order to be relieved from the obligation to make capacity payments. Because such a determination is a utility-specific determination, and affects only the utility involved, any challenge is an "as applied" challenge that must be brought in Franklin Circuit Court. (PURPA section 210(g) (16 U.S.C. § 824a)). Accordingly, this Court does not have subject matter jurisdiction over EKPC's petition.

## C. Plaintiff's Action Fails to State a Claim Upon Which Relief Can Be Granted

EKPC's Petition fails to state a claim for relief that is plausible on its face. In reviewing the dismissal of a complaint, a court is to inquire whether the complaint's

factual allegations, together with all reasonable inferences, state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 677-679 (2009). Here EKPC's claim is more a quibble with PURPA itself and the FERC than with the PSC's orders and regulations implementing PURPA. Taken as true all of EKPC's allegations, EKPC is not entitled to any relief because PURPA does not allow the type of relief EKPC seeks.

EKPC's petition proposes to upend four decades of cooperative federalism by asking the Court to shift ratemaking authority from the states to a utility. EKPC advocates for a scheme where a utility, and not the PSC, weighs evidence, and finds facts regarding ratemaking for "avoided costs," and determining when or if a utility has "excess capacity," all because a federal court gave them approval to do so.

Neither PURPA nor the FERC's order or rules dictate that a particular methodology be used when calculating "avoided costs." PURPA and the FERC policy provide states the flexibility to calculate a utility's avoided rate cost. In FERC Order No. 872, the FERC emphasized its continued reliance on flexible implementation of PURPA stating "[s]ince its inception, the Commission's PURPA Regulations have established rules and defined boundaries allowing states flexibility within those boundaries in implementing PURPA as appropriate for each state. As commenters noted, this allows states to address their unique circumstances and best address each states' needs." *Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies* Act of 1978, Order No. 872, 172 FERC ¶ 61,041, P 690 (2020). The FERC has set forth multiple *per se* reasonable methodologies for calculating a utility's avoided cost, inter alia, competitive market

prices for avoided energy cost (including locational marginal pricing, market hub prices, and formulas based on natural gas prices). *Id.* at 71-125. The FERC, in amending Order No. 872, further clarified that it was not imposing a particular methodology, "[r]egarding QF rates, the final rule provides states further flexibility to better enable states to implement PURPA's statutory obligation that QF rates not exceed the purchasing electric utility's avoided costs." *Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies Act of 1978*, 173 FERC ¶ 61,158, 61,955 (2020). The FERC further noted that the amended order, "granted states the flexibility to choose to adopt one or more of these options or to continue setting QF rates under the standards long established in the PURPA Regulations." *Id.* at 61,951. Nowhere in PURPA or the FERC's rules and orders is there a preference for or requirement to use newly adopted *per se* or rebuttable reasonable avoided cost calculations based on market prices such as EKPC asserts this Court should dictate the PSC adopt.

In short, because PURPA does not impose a particular methodology be used in calculating "avoided costs," PURPA does not empower the Court to impose such a mandate. EKPC's request that the Court do so, therefore, states a claim upon which no relief may be based.

As discussed, *supra*, Kentucky is a vertically integrated, non-restructured state, wherein the PSC ensures that its jurisdictional utilities have sufficient resource adequacy to meet the needs of each individual utility. The Federal Power Act leaves to states jurisdiction over decisions regarding generation and Kentucky

has not relinquished its role in ensuring resource adequacy to an RTO, and thus PURPA does not affect or alter the PSC's jurisdiction to determine if a utility's generation capacity and mix meets the requirements necessary for that utility to provide adequate, efficient, and affordable service. *See* KRS 278.030(2) ("Every utility shall furnish adequate, efficient and reasonable service, and may establish reasonable rules governing the conduct of its business and the conditions under which it shall be required to render service.") The PSC, acting within its jurisdiction, does not allow a utility to depend on capacity markets, such as PJM's BRA or incremental auctions, to meet the long-term generation needs of that utility. Neither PURPA nor the FERC mandate this result. Because the PSC expects utilities in Kentucky to have satisfactory generating capacity to serve their native, retail demands, the capacity costs Kentucky utilities are avoiding are not necessarily capacity market clearing prices.

EKPC requests that the Court endeavor into ratemaking by mandating the PSC adopt EKPC's preferred methodology of calculating avoided costs. While doing so, the Court would also effectively condone that participating in the capacity market is the proper way for EKPC to obtain generating capacity to meet its generating needs. Put differently, EKPC is requesting that the Court supplant the judgment of the PSC in determining the appropriateness of the type of generating capacity that EKPC should acquire if it needs to acquire generation capacity. No provision in federal law, especially PURPA, grants the Courts the jurisdiction to make such a

determination. Because PURPA does not allow the Court to grant the relief that EKPC requests, EKPC fails to state a claim upon which relief may be based.

Should EKPC believe the PSC determines the utility's avoided costs and QF purchase rates at amounts contrary to PURPA, their relief sits with Franklin Circuit Court, not here.

## **<u>CONCLUSION</u>**

The Court should grant the Defendant's motion to dismiss.


/s/ John E.B. Pinney
John E.B. Pinney (Bar # 88031)
Justin M. McNeil (Bar # 95056)
Kentucky Public Service Commission
211 Sower Blvd.
P.O. Box 615
Frankfort, Kentucky 40601
Jeb.pinney@ky.gov
Justin.mcneil@ky.gov

## CERTIFICATE OF SERVICE

I filed the above document on December 5, 2022 using the Court's CM/ECF system, which will electronically serve a copy to all counsel of record.

/s/ John E.B. Pinney
*Counsel for Defendant*