UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

| | |
|---|---|
| East Kentucky Power Cooperative, Inc., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 3:22-CV-00063-GVT |
| ) | |
| Kentucky Public Service Commission; ) | |
| Kent A. Chandler, Chairman; ) | |
| Angela C. Hatton, Vice Chairman; and ) | |
| Mary Pat Regan, Commissioner, ) | |
| ) | |
| Defendants. ) | |

## SECOND AMENDED PETITION FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff East Kentucky Power Cooperative, Inc. ("EKPC" or "Plaintiff") files this Second Amended Petition for Declaratory and Injunctive Relief against the Kentucky Public Service Commission ("Kentucky PSC"); Kent A. Chandler, in his official capacity as Chairman of the Kentucky PSC; Angela C. Hatton, in her official capacity as Vice Chairman of the Kentucky PSC; and Mary Pat Regan, in her official capacity as Commissioner of the Kentucky PSC (each, a "Defendant," and collectively, the "Defendants") under Rule 15(a)(2) of the Federal Rules of Civil Procedure. EKPC first amended its petition as a matter of course under Rule 15(a)(1)(B). The First Amended Petition was filed on December 27, 2022 (Doc. # 11). Rule 15(a)(2) allows a party to amend its pleading a second time "only with the opposing party's consent or the court's leave." Fed. R. Civ. P. 15(a)(2). Defendants have consented to EKPC amending its petition a second time, and the Court has granted leave for EKPC to file the Second Amended Petition. *See* "Agreed Order Granting Leave to File Second Amended Complaint and Denying Defendants' Motion to Dismiss as Moot" (filed Aug. 18, 2023) (Doc # 17); "Order" (Aug. 25, 2023) (Doc # 18) (granting Agreed

Order, allowing filing of second amended complaint, and denying pending motion to dismiss as moot). Therefore, the Second Amended Petition is permitted under Rule 15(a)(2).

## Introduction

1.  Through this Petition, EKPC seeks declaratory and injunctive relief to ensure that the Kentucky PSC properly implements the requirements of the Public Utility Regulatory Policies Act of 1978, as amended ("PURPA"), that Defendants Chandler, Hatton, and Regan cease violating PURPA, and thereby to ensure that retail customers in rural Kentucky are not subsidizing the development of PURPA qualifying facilities.

2.  EKPC previously sought such relief from the Federal Energy Regulatory Commission ("FERC"). The law grants FERC discretion as to whether to initiate an enforcement action to provide such relief. Consistent with its approach to other similar petitions, FERC declined to initiate an enforcement action. FERC's inaction is a necessary condition under PURPA that allows EKPC to present this important matter to this Court for resolution.

3.  PURPA requires electric utilities like EKPC to purchase, in certain circumstances, electric capacity and/or energy offered by "qualifying facilities." The relief requested by EKPC here is necessary to ensure that EKPC is not required to (1) purchase from "qualifying facilities" electric capacity that is not needed, or (2) pay more for any needed electric capacity purchased from "qualifying facilities" than is required by PURPA and FERC's implementing regulations. The costs of any such purchases are borne by EKPC's 16 member-owner distribution cooperatives that EKPC serves and the retail customers that they in turn serve.

4.  EKPC demonstrated in its petition to FERC, and will demonstrate to this Court, that the Kentucky PSC's PURPA regulations and orders with respect to the purchase of and price

2

for such capacity from "qualifying facilities" are contrary to the requirements of PURPA and FERC's implementation of PURPA; that, as a result, EKPC would pay more for such purchases than is required by law; and that EKPC and the rural community consumers that it serves would therefore suffer financial harm. For these reasons, EKPC seeks declaratory and injunctive relief in this matter.

### Parties

5. Plaintiff East Kentucky Power Cooperative, Inc. is a not-for-profit, member-owned state-regulated generation and transmission cooperative corporation incorporated under the laws of the Commonwealth of Kentucky, with its principal place of business located in Winchester, Kentucky. EKPC is responsible for providing and delivering reliable energy to its 16 member-owner distribution cooperatives that power homes and businesses for over one million Kentucky residents located in 87 counties in eastern Kentucky, including some of the most economically vulnerable communities in the nation. Of the eastern Kentucky counties served by EKPC and its owner–member distribution cooperatives, 40 counties experience persistent poverty, as reported by the United States Department of Agriculture.

6. Defendant Kentucky Public Service Commission is a three-member administrative body organized under Chapter 278 of the Kentucky Revised Statutes, with its headquarters located in Frankfort, Kentucky.

7. Defendant Chandler is Chairman of the Kentucky PSC. Defendant Hatton is Vice Chairman of the Kentucky PSC. Defendant Regan is a Commissioner of the Kentucky PSC.

### Jurisdiction

8. As set forth below, this Court has jurisdiction over this matter pursuant to PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a–3(h)(2)(B).

9. EKPC petitioned FERC requesting that FERC initiate an enforcement action pursuant to PURPA Section 210(h)(2)(A), 16 U.S.C. § 824a–3(h)(2)(A). *East Kentucky Power Cooperative, Inc.*, "Petition of East Kentucky Power Cooperative, Inc. for Enforcement of PURPA," FERC Docket No. EL22-50-000 (filed Apr. 8, 2022) ("FERC Petition").

10. FERC declined to initiate an enforcement action in response to EKPC's FERC Petition. *East Kentucky Power Cooperative, Inc. v. Kentucky Public Service Commission*, "Notice of Intent Not to Act," FERC Docket No. EL22-50-000 (Jun. 7, 2022) ("FERC Notice").

11. Accordingly, EKPC has satisfied the requirements of PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a–3(h)(2)(B), for bringing this enforcement action in United States District Court.

12. This Court is the "appropriate United States district court" in which to bring this action, 16 U.S.C. § 824a–3(h)(2)(B), because this action arises under and is authorized by a federal statute (PURPA), and EKPC's service territory and the Kentucky PSC's headquarters are within the Eastern District of Kentucky. 28 U.S.C. §§ 1331, 1391.

13. EKPC also brings this action against Defendants Chandler, Hatton, and Regan in their official capacities as Commissioners of the Kentucky PSC. This Petition alleges an ongoing violation of federal law and seeks prospective relief against continuing violations by Defendants Chandler, Hatton, and Regan. *See Franklin Energy Storage One, LLC v. Kjellander*, 2020 U.S. Dist. LEXIS 8892, *51-*52 (D. Id. 2020) (finding jurisdiction over state public service commissioners sued in their individual capacity and granting PURPA Section 210(h)(2)(B) implementation complaint).

**Background**

EKPC, PJM, and PJM Capacity Auctions

14. EKPC is a generation and transmission cooperative, owned by its 16 member-owner distribution cooperatives. EKPC supplies and delivers reliable power to the member-owner distribution cooperatives, who in turn deliver and sell power to their member-owner retail consumers.

15. EKPC owns and has contracted to purchase on a firm basis electric generation to supply the electric requirements of its member-owner distribution cooperatives.

16. EKPC is a generation and transmission owning member of PJM Interconnection, L.L.C. ("PJM"), and is a market participant in the markets administered by PJM. PJM is a limited liability company organized and existing under the laws of the State of Delaware. PJM is a regional transmission organization ("RTO") for all or portions of Delaware, the District of Columbia, Illinois, Indiana, Kentucky, Maryland, Michigan, New Jersey, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. PJM is authorized by FERC to administer an Open Access Transmission Tariff ("Tariff"), provide transmission service under the Tariff on the electric transmission facilities under PJM's control, operate energy and capacity markets, and otherwise conduct the day-to-day operations of the bulk power system of a multi-state electric control area. (The acronym "PJM" comes from the three states that originally formed the organization, **P**ennsylvania, New **J**ersey, and **M**aryland.)

17. PJM operates an electric capacity market that allows load-serving entities ("LSEs") (i.e., utilities) in the PJM region to acquire and sell electric generation capacity. LSEs needing capacity to meet their load-serving obligations can acquire capacity in the market, and LSEs and

5

other generators with excess capacity can sell their capacity in the market. LSEs' capacity load-serving obligations are generally based on their forecast summer peak demand plus a reserve margin. EKPC has sufficient capacity resources in its portfolio to satisfy its summer peak load requirements (peak demand plus reserve margin) in PJM. EKPC is a winter-peaking utility, and relies upon a portfolio of owned and purchased capacity resources to serve its load.

18.     The capacity market consists of a series of auctions administered by PJM. The "Base Residual Auction" generally is conducted three years in advance of the "Delivery Year," i.e., the twelve month period (June 1 – May 31) in which generation capacity that is committed in the market must be made available to operate at PJM's direction and must offer into PJM's Day-Ahead Energy Market. Sellers that fail to make their generation capacity that cleared the capacity market available in the Delivery Year (e.g., due to equipment failure or fuel unavailability) must acquire replacement capacity or be subject to financial penalty.

19.     EKPC is a "Self-Supply Entity" in PJM, which means that it uses its owned and contracted capacity resources to satisfy its capacity load-serving obligation under PJM's Tariff. EKPC is obligated to offer all of its owned and contracted generation supply resources into the Base Residual Auction. The Base Residual Auction settles such that EKPC would purchase from the market if it did not have sufficient resources to match its load obligation (forecast peak demand plus reserve margin), and would be paid from the market if more of its offered resources cleared than what was needed to satisfy its load obligation.

20.     In order to meet the needs of LSEs after the Base Residual Auction but before the Delivery Year, PJM also conducts "Incremental Auctions." The Incremental Auctions can be used to replace capacity committed in the Base Residual Auction or to procure additional capacity

should the PJM region's expected load in the Delivery Year be higher than forecast at the time the Base Residual Auction was conducted. The Incremental Auctions are held closer to the Delivery Year; in contrast, the Base Residual Auction generally is conducted three years before the Delivery Year. PJM typically conducts three Incremental Auctions for each Delivery Year, with each Incremental Auction successively closer in time to that Delivery Year.

21. EKPC owns or has contracted for (i.e., purchased) sufficient electric capacity to meets its PJM load-serving obligation. From time to time, EKPC has used the Third Incremental Auction to replace a capacity commitment immediately prior to the start of the Delivery Year. The Third Incremental Auction is the Incremental Auction that takes place closest in time to the beginning of the next Delivery Year and takes into account all generation capacity retirements and additions that have occurred since the original Base Residual Auction for the upcoming Delivery Year. Therefore, the Third Incremental Auction provides the clearest indicator of the current market value of generation capacity available for usage during the upcoming Delivery Year.

22. As explained in EKPC's FERC Petition (at 23), the Third Incremental Auction clearing price for the 2021/2022 Delivery Year was $20.55/MW-day. In contrast, the Base Residual Auction clearing price for the 2021/2022 Delivery Year was $140.00/MW-day. More recently, the Third Incremental Auction clearing price for the 2022/2023 Delivery Year was $19.00, and the Base Residual Auction clearing price for the 2022/2023 Delivery Year was $50.00. (PJM capacity auction clearing prices are available at: https://www.pjm.com/markets-and-operations/rpm.aspx.)

PURPA and Kentucky PSC Regulations and Proceedings

23. PURPA generally requires electric utilities to purchase electric energy and capacity made available by qualifying small power production and cogeneration facilities ("qualifying facilities," or "QFs"). The price to be paid for such mandatory purchases under PURPA may not exceed the purchasing utility's avoided cost, i.e., the incremental cost to the electric utility of power that it otherwise would generate or purchase itself if it did not purchase from the QF. *See* 16 U.S.C. § 824a–3(b) (rates for purchases from QFs may not exceed "the incremental cost to the electric utility of alternative electric energy"); 18 C.F.R. § 292.101(b)(6) (2022) (FERC regulation defining "avoided costs" as "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source"); 18 C.F.R. § 292.304(a)(2) (2022) (FERC regulation providing that an electric utility is not required "to pay more than the avoided costs for purchases" from QFs).

24. In cases in which an electric utility possesses excess capacity such that additional capacity is unnecessary to meet its total system load, the cost to purchase additional capacity from a QF should be zero, because no costs are avoided with such purchase of additional capacity. *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, FERC Stats. & Regs. ¶ 30,128, at 30,870, 30,871, *order on reh'g*, Order No. 69-A, FERC Stats. & Regs. ¶ 30,160 (1980), *aff'd in part & vacated in part sub nom. Am. Elec. Power Serv. Corp. v. FERC*, 675 F.2d 1226 (D.C. Cir. 1982), *rev'd in part sub nom. Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402 (1983).

25. FERC has terminated EKPC's obligation to enter into new contracts or obligations to purchase electric energy and capacity from small power production QFs with a net capacity greater than 5 megawatts ("MW") and cogeneration QFs with a net capacity greater than 20 MW in the PJM region on a service territory-wide basis. *East Kentucky Power Cooperative, Inc.*, Letter Order, FERC Docket No. QM22-5-000 (Jan. 5, 2022) (unpublished); *East Kentucky Power Cooperative, Inc.*, 160 FERC ¶ 61,053 (2017), *order denying clarification and reh'g*, 162 FERC ¶ 61,267 (2018). FERC has not terminated EKPC's obligation to enter into new contracts or obligations to purchase electric energy and capacity from small power production QFs with a net capacity of 5 MW or less and cogeneration QFs with a net capacity of 20 MW or less.

26. Pursuant to FERC's implementation of PURPA, an electric utility's ratepayers should be financially indifferent as to whether the utility purchases electric energy and capacity from a QF or generates or purchases the electric energy and capacity from another source. Order No. 69 at 30,868 ("the total costs to the utility and the rates to its other customers should not be greater than they would have been had the utility not made the purchase from the [QF]"), 30,871 ("purchasing utility must be in the same financial position it would have been had it not purchased the [QF's] output"); *Oglethorpe Power Corp.*, 32 FERC ¶ 61,103 (1985) (referencing the "principle" from Order No. 69 that "a purchasing utility should be in the same financial position it would have been had it not purchased from the QF"). PURPA is not intended to require a utility's rate-regulated customers to subsidize a QF through the utility's purchase of QF capacity or energy at a price greater than what the utility otherwise has available to it. *Qualifying Facility Rates and Requirements; Implementation Issues Under the Public Utility Regulatory Policies Act of 1978*, Order No. 872, 172 FERC ¶ 61,041, at PP 12 ("Nothing in the text of PURPA requires the establishment of a subsidy for QFs. This point was confirmed in the Conference Report

9

accompanying PURPA's passage: 'The provisions of this section are not intended to require the rate payers of a utility to subsidize cogenerators or small power producers.'" (quoting H.R. Rep. No. 95-1750, at 98 (1978))), 14 ("This upper limit on QF rates established in [PURPA] section 210(b), equal to a purchasing utility's incremental costs, commonly called 'avoided costs,' implements Congress's intent that QFs not be subsidized. It ensures that the purchasing utility cannot be required to pay more for power purchased from a QF than it would otherwise pay to generate the power itself or to purchase power from a third party."), *order addressing arguments raised on reh'g and clarifying prior order in part*, Order No. 872-A, 173 FERC ¶ 61,158 (2020), *appeal pending sub nom. Solar Energy Indus. Ass'n v. FERC*, Case Nos. 20-72788, *et al.* (9th Cir.).

27. PURPA requires state regulatory authorities like the Kentucky PSC to implement PURPA's requirements, including the mandatory QF purchase obligation, for the electric utilities that they regulate. 16 U.S.C. § 824a–3(f). The Kentucky PSC has adopted regulations to implement PURPA's purchase requirements. 807 KAR 5:054, § (6).

28. State regulatory authorities also may implement PURPA's requirements through orders and adjudicated proceedings. *See, e.g.*, *Cedar Creek Wind, LLC*, 137 FERC ¶ 61,006, at P 27 (2011) ("A 'state commission may comply with the statutory requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking other actions reasonably designed to give effect to [FERC's] rules.'" (quoting *FERC v. Mississippi*, 456 U.S. 742, 751 (1982))).

29. The Kentucky PSC's PUPRA implementation regulations require each electric utility to "purchase any energy and capacity which is made available from a [QF]," except when

the cost to purchase from the QF would exceed the cost that the utility would incur to generate the energy purchased from the QF or in the event of a system emergency if the utility's purchases from the QF would contribute to such emergency. 807 KAR 5:054, § 6(1).

30. Pursuant to the Kentucky PSC's PURPA implementation regulations, EKPC is required to submit a schedule (tariff) identifying the rates it would pay for electric energy and capacity purchased from QFs. 807 KAR 5:054, §§ (7)(2), (7)(4).

31. The Kentucky PSC's PURPA implementation regulations provide for rates for a utility's purchase of output of QFs with a design capacity both over and under 100 kW. In each instance, the electric utility is required to provide a standard rate schedule for QFs, which "shall be based on avoided costs." 807 KAR 5:054, §§ 7(2), 7(4). The Kentucky PSC's regulations also specify that, with respect to QFs with a design capacity over 100 kW, these rates "shall be used only as the basis for negotiating a final purchase rate with [QFs] after proper consideration has been given to factors affecting purchase rates listed in [807 KAR 5:054, § 7(5)(a)]." 807 KAR 5:054, § 7(4).

32. The Kentucky PSC's PURPA implementation regulations do not limit the price that a purchasing electric utility must pay to a QF to no more than the utility's avoided cost, nor do the Kentucky PSC's PURPA implementation regulations limit the utility's avoided capacity price to $0 when the utility does not need any capacity.

33. On March 22, 2021, EKPC and its 16 member-owner distribution cooperatives filed with the Kentucky PSC revised tariffs setting forth revised rates for the purchase of electric energy and capacity from QFs. *Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified*

*Cogeneration and Small Power Production Facilities Tariffs*, PSC Case No. 2021-00198 (filed Mar. 22, 2021). EKPC proposed to revise the rate schedules for QF purchases from dispatchable generation sources, including increasing the capacity rate payable to QFs (from $3.81 per kW-year to $7.86 per kW-year). These capacity prices reflected the results of PJM's Third Incremental Auction for delivery year 2021/2022, which was the most recently held Third Incremental Auction at the time of EKPC's filing with the Kentucky PSC. EKPC also proposed certain revisions related to QF purchases for non-dispatchable generation sources unrelated to the avoided capacity rate.

34. On May 24, 2021, the Kentucky PSC established a proceeding to investigate the reasonableness of the revisions proposed by EKPC and its 16 member-owner distribution cooperatives to their respective tariffs governing purchases of electric capacity and energy from QFs. In its May 24, 2021 order, the Kentucky PSC suspended the tariff effective date for five months, and established further proceedings to investigate the proposed tariff changes. *Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*, Order, PSC Case No. 2021-00198 (May 24, 2021).

35. On October 26, 2021, the Kentucky PSC approved EKPC's proposed energy rates, but determined that the use of the most recent PJM Base Residual Auction capacity market clearing price, rather than the clearing price from the PJM Third Incremental Auction as proposed by EKPC, should be used as the capacity price in EKPC's QF purchase tariff. *Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*, Order, PSC Case No. 2021-00198 (Oct. 26, 2021).

36. EKPC sought rehearing of the October 26, 2021 order. The Kentucky PSC denied EKPC's rehearing request. *Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*, Order, PSC Case No. 2021-00198 (Nov. 30, 2021).

EKPC's FERC Enforcement Petition

37. PURPA Section 210(h)(2)(B) permits an electric utility, such as EKPC, to petition FERC to initiate an enforcement action against a state regulatory authority, such as the Kentucky PSC, for the state regulatory authority's failure to properly implement FERC's PURPA regulations on determining avoided costs. 16 U.S.C. §§ 824a–3(a), 824a–3(h)(2)(B); 18 C.F.R. § 292.304 (2022) (FERC regulation setting forth rules on rates for purchases from QFs and methods for calculating avoided costs).

38. In its FERC Petition, EKPC requested that FERC initiate an enforcement action against the Kentucky PSC. EKPC demonstrated that the Kentucky PSC's PURPA implementation regulations and orders with respect to the ***purchase of*** and ***price for*** QF capacity were contrary to the requirements of PURPA and FERC's implementation of PURPA; that, as a result, EKPC would pay more than its avoided costs for such purchases; and that EKPC would therefore not be financially indifferent to purchasing capacity from QFs. EKPC explained that the overpayment for QF capacity purchases would harm retail consumers because they would have to pay for such purchases through EKPC's and its member-owner distribution cooperatives' electricity rates. EKPC therefore requested that FERC initiate an enforcement action against the Kentucky PSC to ensure that EKPC is not required to pay more than its incremental costs for the purchase of QF capacity.

13

39.     In the FERC Notice, FERC declined, without explanation or rationale, to initiate an enforcement action, thereby allowing EKPC to "bring an action in the appropriate United States district court to require [the Kentucky PSC] to comply" with the requirements of PURPA. 16 U.S.C. § 824a–3(h)(2)(B). FERC confirmed in the FERC Notice, citing 16 U.S.C. § 824a–3(h)(2)(B), that "Our decision not to initiate an enforcement action means that [EKPC] may itself bring an enforcement action against the Kentucky Commission in the appropriate court."

40.     EKPC seeks an order from this Court requiring the Defendants to implement PURPA properly. Proper implementation by the Kentucky PSC will ensure that EKPC is not required to purchase QF capacity when it has no need for such capacity, and that EKPC is not paying more for QF capacity than is required by PURPA when it has a need for capacity. The costs of purchases by EKPC of QF capacity when it is not needed and paying more for QF capacity than is required by law are borne by EKPC's member-owner distribution cooperatives and the retail consumers that they serve.

## Relief Requested

41.     EKPC re-alleges and incorporates by reference the allegations of Paragraphs 1 through 40 of this Petition as if fully set forth herein.

42.     EKPC is an electric utility and seeks enforcement of PURPA Sections 210(a) and 210(b), 16 U.S.C. §§ 824a–3(a), 824a–3(b).

43.     EKPC has been aggrieved by the Defendants' failure to implement the requirements of PURPA because the Kentucky PSC's PURPA implementation regulations and its orders, and Defendants Chandler, Hatton, and Regan voting and taking such actions requiring compliance with those regulations and orders, would require EKPC to pay a price greater than $0 for electric

capacity purchased from QFs when EKPC has no need for such capacity. The costs of such purchases will be borne by EKPC's 16 member-owner distribution cooperatives and the consumers that they in turn serve.

44. EKPC has been aggrieved by the Defendants' failure to implement the requirements of PURPA because the Kentucky PSC's PURPA implementation regulations and its orders, and Defendants Chandler, Hatton, and Regan voting and taking such actions requiring compliance with those regulations and orders, would require EKPC to pay for electric capacity purchased from QFs at a price that exceeds the "incremental cost" to EKPC of "alternative electric energy." 16 U.S.C. § 824a–3(b). Such excessive costs will be borne by EKPC's 16 member-owner distribution cooperatives and the consumers that they in turn serve.

45. Pursuant to PURPA Section 210(h)(2)(B), this Court is authorized to require the Defendants to comply with the requirements of PURPA and to "issue such injunctive or other relief as may be appropriate." 16 U.S.C. § 824a–3(h)(2)(B).

46. This is an action for injunctive, declaratory, and other relief as may be appropriate pursuant to PURPA Section 210(h)(2)(B). 16 U.S.C. § 824a–3(h)(2)(B).

## Prayer for Relief

**Wherefore**, Plaintiff East Kentucky Power Cooperative, Inc. respectfully requests that the Court enter judgment against Defendants Kentucky Public Service Commission; Kent A. Chandler, Chairman; Angela C. Hatton, Vice Chairman; and Mary Pat Regan, Commissioner, as follows:

(1)     Declaring under PURPA Section 210(a) that, when an electric utility has electric capacity, whether owned and/or contracted for, in an amount that meets or exceeds its load requirements, the utility may not be required to pay more than $0 for electric capacity purchased from QFs;

(2)     Declaring under PURPA Section 210(b) that an electric utility's avoided cost rate for capacity may be determined by reference to capacity that is or will be purchased by the electric utility;

(3)     Declaring under PURPA Section 210(b) that the market-clearing price in an organized capacity market auction in which an electric utility acquires capacity to meet its load-serving obligations, or to replace capacity resource commitments if it had sufficient owned and/or contracted resources to meet its load-serving obligations, may be an appropriate measure of the electric utility's incremental cost of capacity;

(4)     Requiring the Kentucky PSC to modify its regulations, issue orders, and take such other action as may be appropriate to comply with the foregoing declarations; and

(5)     Enjoining Defendants Chandler, Hatton, and Regan from violating, and continuing to violate, PURPA Section 210(b) through their votes and actions that require EKPC to comply with rules and orders that are contrary to the foregoing declarations.

        Respectfully submitted,

        s/ Medrith Lee Norman
        Medrith Lee Norman
        Frost Brown Todd LLC
        Lexington Financial Center
        250 West Main Street, Suite 2800
        Lexington, KY 40507-1749
        Tel.: 859-244-3209
        Fax: 859-231-0011
        Email: mnorman@fbtlaw.com

        Daniel E. Frank
        Eversheds Sutherland (US) LLP
        700 Sixth St., N.W., Suite 700
        Washington, DC 20001-3980
        Tel.: 202-383-0838
        Fax: 202-637-3593
        Email: DanielFrank@eversheds-sutherland.com
        (Admitted Pro Hac Vice)

        Counsel for East Kentucky Power Cooperative, Inc.

Dated: August 25, 2023