UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT FRANKFORT

*Electronically filed*

| | |
|---|---|
| EAST KENTUCKY POWER COOPERATIVE, INC.<br>　　Plaintiff<br><br>v.<br><br>KENTUCKY PUBLIC SERVICE COMMISSION, et al.<br>　　Defendants | Civil Action No. 3:22-CV-00063-GVFT |

---

## DEFENDANTS' THIRD MOTION TO DISMISS

---

Comes the Defendants, Kentucky Public Service Commission ("PSC"), Kent A. Chandler, in his official capacity as Chairman of the PSC; Angela C. Hatton, in her official capacity as Vice Chairman of the PSC; and Mary Pat Regan, in her official capacity as Commissioner of the PSC (each, a "Defendant," and collectively, the "Defendants") and hereby moves this Court, pursuant to Fed. R. Civ. P. 12(b)(1) and (6), to dismiss the Second Amended Petition for Declaratory and Injunctive Relief ("Second Amended Petition") filed by East Kentucky Power Cooperative, Inc. ("EKPC"). As grounds for their motion, Defendants state that: (1) this Court lacks subject matter jurisdiction because the Second Amended Petition raises "as-applied" challenges to state regulatory adjudications, which must be brought in state courts; and (2) Plaintiff has not presented sufficiently supported claims upon which relief may be based. In the alternative the Court should dismiss the Second Amended Petition pursuant to the *Burford* Doctrine.

## I.      INTRODUCTION

This case concerns EKPC's claims that PSC regulations and orders are contrary to the requirements of the Public Utility and Regulatory Policies Act of 1978, as amended ("PURPA"). EKPC brings this action against the PSC and its commissioners pursuant to PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B).

Under PURPA, there are two types of challenges: "as applied" and "as implemented." PURPA allocates jurisdiction between federal district courts (PURPA section 210(h)(2) (16 U.S.C. § 824a-3(h)(2)), and state courts (PURPA section 210(g) (16 U.S.C. § 824a)). Challenges to a state regulatory commission's application of its PURPA implementation rules made pursuant to PURPA section 210(g) – "as-applied" claims – must be brought in the state's appellate courts, through the state appellate processes generally available for review of that regulatory commission's determinations. *Portland Gen. Elec. Co. v. FERC*, 854 F.3d 692, 698 (D.C. Cir 2017). "As implemented" challenges are brought in federal court, "[f]ederal courts have exclusive jurisdiction over implementation challenges, while state courts have exclusive jurisdiction over as-applied challenges." *Exelon Wind I, LLC v. Nelson*, 766 F.3d 380, 388 (5th Cir. 2014).

EKPC, without providing anything but cursory statements that the PSC has violated PURPA, brings this action as an as implemented challenge. EKPC has provided no evidence that the PSC has failed to properly implement PURPA and has not and cannot provide evidence that EKPC would be harmed by the PSC's implementation of PURPA. Additionally, the issues that EKPC asks the Court to decide are issues that are now pending before the PSC, which supports dismissal of the Second Amended Petition pursuant to the *Burford* Doctrine.

## II.   BACKGROUND

### A.   PURPA and the Federal Energy Regulatory Commission ("FERC") Rules.

Congress enacted PURPA in 1978 in response to the energy crisis of the 1970s, intending to promote energy conservation. As part of this drive to further energy conservation and efficiency, PURPA was also passed to promote the development of cogeneration and small power production facilities ("qualifying facilities" or "QFs"), which provided a benefit to consumers through an increase in the diversity of energy resources. Qualifying facilities are:

> [A] class of facilities, defined by their size, fuel use, efficiency, and ownership . . . entitled to special treatment under federal and state laws regulating power producers. . . . They generate electricity using alternative fuel sources and sell their output to utilities. Congress enacted the Public Utility Regulatory Policies Act of 1978 (often referred to as "PURPA") to overcome traditional electric utilities' reluctance to purchase power from nontraditional electric generation facilities and to reduce the financial burden from state and federal regulation on nontraditional facilities.

*Adrian Energy Associates v. Michigan Public Service Comm'n*, 481 F.3d 414, 417 (6th Cir. 2007) (Citations omitted).

Congress recognized two major obstacles to QF development. *See FERC v. Mississippi*, 456 U.S. 742, 750-51 (1982). First, Congress recognized that utilities were reluctant to engage with QFs and buy power from them. *Id.* Second, QFs were reluctant to take on the financial burden of traditional utility regulation. *Id.*

PURPA Section 210(a), 16 U.S.C. § 824a-3(a), directed the FERC to promulgate rules requiring electric utilities to purchase energy from QFs, which the FERC deemed necessary to "encourage cogeneration and small power production." Section 210(b) of PURPA, 16 U.S.C. § 824a-3(b), provided that the rules promulgated by the FERC ensure that the rates for power purchases from a QF be "just and reasonable" to the electric consumers of the electric utility, and "not to exceed the cost—called in the statute the 'incremental cost of alternative electric energy'—

the utility would incur in generating the electricity itself or in purchasing it from a non-QF generator." *North American Nat. Resources, Inc. v. Strand*, 252 F.3d 808, 810 (6th Cir. 2001). This is known as the utility's "avoided cost." Capacity costs are the "costs associated with providing the capacity to deliver energy," consisting "primarily of the capital costs of facilities." *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order 69, 45 Fed. Reg 12,214, 12,216 (Feb 25, 1980). Thus, avoided capacity costs, "compensate a QF for the fact that its existence spares the utility certain fixed costs, such as the cost of building and financing generating plants of its own." *Solar Energy Industries Association v. FERC*, ---F.4th---, 2023 WL 5691711, at *6 (9th Cir. Sept. 5, 2023). Avoided capacity costs, "in a QF contract based on a purchasing electric utility's capacity rates should typically be sufficient to recover the QF's financing costs and should therefore continue to facilitate QF financing." *Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies Act of 1978*, Order 872 85 Fed. Reg. 54638-01.

Under PURPA's implementation scheme, section 210(f), 16 U.S.C § 824a-3(f), directed each state regulatory authority to reasonably implement the FERC's section 210(a) rules for each electric utility over which it had ratemaking authority. In 1980, the FERC promulgated PURPA rules for state regulatory authorities to implement section 210(a) rules. Those rules provide that utilities must purchase QF power at a rate equal to the utility's avoided cost. 18 C.F.R. §§ 292.101(b)(6) and 292.304(b)(2).

PURPA § 210 was intended "to increase the utilization of cogeneration and small power." *American Paper Institute, Inc. v. American Elec. Power Service Corp.*, 461 U.S. 402, 417 (1983) (*citing FERC v. Mississippi*, 456 U.S. at 750–751). In a case challenging the FERC's usage of the

full-avoided-cost rate under § 210(b) of PURPA, the Supreme Court held that the FERC was justified in prescribing such a rate as it would provide the maximum incentive for the development of cogeneration and small power production as envisioned under PURPA. *American Paper Institute, Inc.,* 461 U.S. at 412-418.

PURPA *does not* require that a state public utilities commission, such as the PSC, adopt a specific rate or rate scheme. The state commission may implement PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by adopting any other means that reasonably give effect to FERC's regulations." *FERC v. Mississippi*, 456 U.S. at 749–51. Likewise, the FERC's regulations afford state commissions a "wide degree of latitude" in determining how to implement PURPA. *Cal. Pub. Util. Comm'n*, 133 FERC ¶ 61,059, at ¶ 24 (2010). As long as an implementation plan is consistent with federal law, the FERC does not "second-guess" the state commission. *Id.*

**B.    The PSC and PSC Regulation.**

The PSC is the state agency that regulates public utilities in Kentucky. *See generally,* Kentucky Revised Statues ("KRS") Chapters 74, 278, and 279. EKPC is a member owned electric generator that provides wholesale electricity to its 16 member-owner rural electric distribution cooperative corporations ("RECCs").

**C.    Plaintiff's Proceedings Before the PSC.**

On March 22, 2021, EKPC and its 16 member-owner RECCs filed with the PSC revised tariff sheets setting forth proposed rates for the purchase of electric energy and capacity from QFs. On May 24, 2022, pursuant to KRS 278.190, the PSC established a proceeding to investigate the reasonableness of the proposed tariff rates, and suspended the proposed rates for five months, until October 31, 2021, in PSC Case No. 2021-00198, *Electronic Tariff Filing of East Kentucky Power*

*Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs.*

Of significance to the instant proceeding and the proceeding before the PSC, in 2013, EKPC fully joined PJM Interconnection, Inc. ("PJM"), a regional transmission organization ("RTO").[1]  PJM operates an energy and capacity market which encompasses 13 states and the District of Columbia, in which EKPC participates.  As a Self-Supply participant in PJM's capacity market, officially called the Reliability Pricing Model ("RPM"), as well as being a Load Serving Entity ("LSE") with an established obligation to serve customers, EKPC must commit the entirety of its generation resources into the capacity market.  The Base Residual Auction ("BRA") is the primary capacity market auction, usually run annually on a three year forward basis, e.g., the BRA for the 2020/21 Delivery Year was run in May 2017.  EKPC must commit its generation resources into the BRA and pay the resulting market clearing price to purchase its administratively determined demand back. If EKPC's generation resources clear the auction such that it has a surplus of capacity exceeding its native load obligation, EKPC is paid for that surplus capacity at the market clearing price.  If EKPC's generation resources do not all clear the market and it has a capacity shortfall below its native load obligation, it must purchase the required capacity from the market at the market clearing price.

Because the BRA is conducted three years forward, PJM also conducts three incremental auctions which are successively closer in time to the delivery year.  These incremental auctions

---

[1] EKPC could only join PJM with PSC approval because in order to fully join PJM EKPC was required to transfer functional control of all of EKPC's transmission lines and substations operating at or above 100 kV to PJM. *See* KRS 278.218.  The PSC approved EKPC's membership in PJM on December 20, 2012.  EKPC's *See, In the Matter of: Application of East Kentucky Power Cooperative, Inc. to Transfer Functional Control of Certain Transmission Facilities to PJM Interconnection, LLC,* 2012-00169, 2012 WL 6705962, (Dec. 20, 2012).

allow for replacement resource procurement, procurement of extra resources, or for the sale of excess resources as necessary to correspond with an LSE's most current reliability requirements.

Regardless of EKPC's PSC-approved participation in PJM and its related markets, the PSC's regulation of EKPC has not changed since it joined PJM. EKPC's obligations under Kentucky law, especially how it meets its capacity obligations to its native load, are exactly the same as they were before it was permitted to become a full member and participant in PJM.

In Case No. 2021-00198, EKPC did not propose that its avoided capacity costs be $0. Rather, EKPC proposed that the avoided capacity cost should be the cost of PJM's most recent incremental auction. The PSC, however, found that the PJM BRA capacity market-clearing price was the most accurate interim proxy to determine EKPC's avoided capacity costs and ordered EKPC to use it until EKPC filed its next annual COGEN/SPP tariff filing update, which EKPC and its member cooperatives have now done.[2]  *See* Ex. A.  Noting EKPC's obligations under Kentucky law and its expectation EKPC would have enough power owned or contracted to serve the retail demand of EKPC's 16 member-owners, the PSC expressed a preference for EKPC to use a unit cost or bilateral contract cost as the basis for determining EKPC's avoided capacity costs, as the PSC explained its interest in ensuring EKPC does not meet its native capacity demand through competitive market products.

EKPC advocated for a market-clearing price as the most appropriate measure for determining its avoided capacity rate, but preferred the market-clearing price for the third incremental auction instead of the base auction, reasoning that it was more accurate since it was

---

[2] EKPC and its member cooperatives, on May 3, 2023, filed proposed tariffs containing updated QF rates. The PSC, pursuant to KRS 278.190, has suspended the effective date of the rates and is currently investigating the reasonableness of the proposed rates.  The case is docketed as Case No. 2023-00153, *Electronic Tariff Filing Of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*.  The suspension ends on November 1, 2023.  The PSC must issue an Order no later than October 31, 2023, or the proposed rates will become effective.

the closest auction in time to the delivery year. The PSC explained that the third incremental auction was inappropriate because the BRA is where EKPC must commit its generation resources and purchase an amount equal to its required load back, which is a much better proxy for its avoided cost. The PSC stated that it expected EKPC to use future tariff filings to develop a more robust record including the most recent BRA results, EKPC's actual cost for a unit of physical capacity, whether purchased or built, and information regarding the capacity contribution of non-dispatchable resources, upon which the PSC could make findings and best determine the most appropriate proxy for EKPC's avoided capacity cost rate going forward. The PSC subsequently denied EKPC's request for rehearing on this issue. *See* Ex. B.

        **D.**      **Plaintiff's Proceedings Before the FERC.**

On April 8, 2022, nearly 130 days after the PSC denied EKPC's motion for rehearing, EKPC filed a petition with the FERC ("FERC Petition"). *See* Ex. C. EKPC alleged that the PSC has:

> [*C*]*onsistently failed to implement* PURPA's requirement, as set forth in the Commission's PURPA regulations, that the price to be paid by an electric utility to QFs for power purchased from the QFs not exceed the incremental cost to the electric utility of power that it otherwise would generate or purchase itself (i.e., the electric utility's "avoided cost").

FERC Petition at 9.

EKPC alleged (in allegations notably absent from its current amended petition) that the PSC had erroneously set the avoided capacity costs for QF not just for EKPC, but for three other electric utilities: Kentucky Power Company; Louisville, Gas and Electric Company; and Kentucky Utilities Company. In response, the PSC ably proved that it had properly implemented PURPA in determining capacity costs for these utilities and EKPC. *See* Ex. D. Ultimately, the FERC issued a notice declining to initiate an enforcement action against the PSC. *See* Ex. E.

## II.    APPLICABLE STANDARDS

### A.    Standard for a Motion to Dismiss Under Fed. R. Civ. Pro 12.

Under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a motion to dismiss should be granted where the Court lacks subject matter jurisdiction over the subject of the action based upon PURPA's requirements that an "as applied" challenge be brought in state court.  (PURPA section 210(g) (16 U.S.C. § 824a)).  *See Valentin v. Hospital Bella Vista,* 254 F.3d 358, 362–63 (1st Cir. 2001) (Rule 12(b)(1) "is a large umbrella, overspreading variety of different types of challenges to subject-matter jurisdiction. Some challenges—those grounded in considerations of ripeness, mootness, sovereign immunity, and the existence of federal question jurisdiction are good examples[]").

When considering a motion to dismiss for failure to state a claim under Fed. R. Civ. Pro. 12(b)(6), the Court must determine if the "complaint states a plausible claim for relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950, 173 L. Ed. 2d 868 (2009). Under this standard, the plaintiff must provide the grounds for his relief which "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  A court must be able to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949.  A complaint must establish more than just statements that are "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct[.]" *Id.* at 1949, 1950. If the allegations do not "'show that the pleader is entitled to relief,'" then the complaint fails. *Id.* at 1950.

**B.    Standard for Abstention and Dismissal Under the *Burford* Doctrine.**

A Federal Court may abstain from deciding a matter and dismiss the matter if under

the Burford Doctrine which provides:

> Where timely and adequate state-court review is available, a federal court sitting in
> equity must decline to interfere with the proceedings or orders of state
> administrative agencies: (1) when there are difficult questions of state law bearing
> on policy problems of substantial public import whose importance transcends the
> result in the case the at bar; or (2) where the exercise of federal review of the
> question in a case and in similar cases would be disruptive of state efforts to
> establish a coherent policy with respect to a matter of substantial public concern.

*New Orleans Pub. Serv., Inc. v. Council of City of New Orleans (NOPSI)*, 491 U.S. 350, 361, 109
S.Ct. 2506, 105 L.Ed.2d 298 (1989) (quoting *Colo. River Water Conservation Dist.*, 424 U.S. at
814, 96 S.Ct. 1236) (internal quotations omitted).

## III.    ARGUMENT

**A.    The Court Lacks Jurisdiction Because EKPC's Challenge Should Be an "As-Applied" Challenge.**

EKPC's Petition fails to state a claim for relief that is plausible on its face.  Here, EKPC's

claim is more a quibble with PURPA itself and the FERC than with the PSC's orders and

regulations implementing PURPA.  Taking as true all of EKPC's allegations, EKPC is not entitled

to any relief because PURPA does not allow the type of relief EKPC seeks.  EKPC has provided

no evidence that the PSC's orders or regulations violate PURPA, and instead only labels its action

as an "as implemented challenge" and alleges that the PSC's rules and regulations violate PURPA

with no supporting evidence or facts.  Rather, the PSC's order implementing PURPA shows that,

only when a utility satisfies the PSC that the utility has satisfied its capacity needs, can the avoided

capacity be $0.

The Court, furthermore, does not have subject matter jurisdiction over Plaintiff's Petition

because the Petition brings "as-applied" claims that federal law requires plaintiffs to raise in state

courts.

PURPA allocates jurisdiction between federal district courts (PURPA section 210(h)(2) (16 U.S.C. § 824a-3(h)(2)), and state courts (PURPA section 210(g) (16 U.S.C. § 824a)). Challenges to a state regulatory commission's application of its PURPA implementation rules made pursuant to PURPA section 210(g) – "as-applied" claims – must be brought in the state's appellate courts, through the state appellate processes generally available for review of that regulatory commission's determinations. *Portland Gen. Elec. Co. v. FERC*, 854 F.3d 692, 698 (D.C. Cir 2017) ("State-based adjudication serves as the mainstay for enforcing PURPA rights. PURPA section 210(g)…permits 'any person' to 'bring an action against any electric utility [or] qualifying small power producer…to enforce any requirement' created by a state's implementation of PURPA . . . Reflecting Congress's judgment that 'federal rights granted by PURPA can appropriately be enforced through state adjudicatory machinery,'. . . the statute channels actions under this subsection into 'the appropriate State court,'") (citations omitted); *See Exelon Wind I, LLC v. Nelson*, 766 F.3d 380, 388 (5th Cir. 2014) ("PURPA provides for two types of review of a state utility regulatory authority's actions: implementation and as-applied challenges. . . . Federal courts have exclusive jurisdiction over implementation challenges, while state courts have exclusive jurisdiction over as-applied challenges"); *Pwr. Res. Grp. v. Pub. Utils. Comm'n of Texas*, 422 F.3d 231, 235 (5th Cir. 2005) ("Federal courts may not hear 'as applied' claims, because jurisdiction over such claims is reserved to the state courts").

EKPC's petition is an "as applied" challenge because it applies solely to EKPC. *See Exelon Wind 1,* 766 F.3d at 390–91 (wherein the Fifth Circuit held that Exelon's challenges to an order of the Public Utility Commission of Texas were as-applied challenges since it was found that the order applied PUC Rule 25.242 to an individual petitioner—Exelon—stating that the possibility that the challenges "may establish precedent relevant to future cases does not transform them into

facial or implementation challenges" and accordingly vacated the decision of the district court and dismissed these challenges for lack of subject matter jurisdiction in federal court. The Fifth Circuit held that the district court did not have subject matter jurisdiction to hear Exelon's claim that PUC Rule 25.242 failed to implement FERC's Regulation regarding PURPA.) EKPC has not, and cannot, prove that the relief that it seeks applies to any utility in Kentucky other than itself.

EKPC offers its membership in PJM and its participation in the BRA in support of its petition as grounds for why the Court should exercise jurisdiction and usurp the PSC's traditional role of rate regulation of EKPC. Yet EKPC is the only utility in Kentucky that participates in the BRA at PJM. Thus, the requested relief, particularly in paragraph 3[3] of the prayer for relief in EKPC's petition, would apply only to EKPC.

The relief requested in paragraphs 1[4] and 2[5] of the prayer for relief is also unique to EKPC, because determining when or if a utility has excess capacity in the first place, or what type of capacity is required (e.g., purchased or constructed) is a factual determination that a state makes, not a federal court or the utility.

Kentucky is a vertically integrated, non-restructured state, wherein the PSC ensures that its jurisdictional utilities have sufficient resource adequacy. The Federal Power Act leaves to states jurisdiction over decisions regarding generation: certificates of public convenience and necessity,

---

[3] Requesting that the Court declare "under PURPA Section 210(b) that the market-clearing price in an organized capacity market auction in which an electric utility acquires capacity to meet its load-serving obligations, or to replace capacity resource commitments if it had sufficient owned and/or contracted resources to meet its load-serving obligations, may be an appropriate measure of the electric utility's incremental cost of capacity." [Second Amended Petition at 16].

[4] Requesting that the Court declare "under PURPA Section 210(a) that when an electric utility has electric capacity, whether owned and/or contracted for in an amount that meets or exceeds its load requirements, the utility may not be required to pay more than $0 for electric capacity purchased from QFs." [Second Amended Petition at 16].

[5] Requesting that the Court declare "under PURPA Section 210(b) that an electric utility's avoided cost rate for capacity be determined by reference to capacity that is or will be purchased by the electric utility. . ." [Second Amended Petition at 16].

adequacy investigations, and integrated resource planning. *See generally* 16 U.S.C.A. § 824(b)(1). Neither the PSC nor the Commonwealth of Kentucky have relinquished their roles in ensuring resource adequacy to an RTO as has been done in other jurisdictions within PJM. Therefore, it is the PSC that determines not only if a utility has excess capacity but what type of capacity (purchased, contracted, constructed, etc.) meets a utility's capacity needs.

EKPC's petition proposes to upend four decades of cooperative federalism by asking the Court to shift ratemaking authority from the states to a utility. EKPC advocates for a scheme where a utility, and not the PSC, weighs evidence, and finds facts regarding ratemaking for "avoided costs," and determining when or if a utility has "excess capacity," all because a federal court gave them approval to do so.

The PSC's regulations and orders implementing PURPA are consistent with PURPA, and EKPC's requested relief shows that its Second Amended Petition is an "as-applied" challenge.

EKPC alleges that it:

> [H]as been aggrieved by the Defendants' failure to implement the requirements of PURPA because the Kentucky PSC's PURPA implementation regulations and its orders, and Defendants Chandler, Hatton, and Regan voting and taking such actions requiring compliance with those regulations and orders, would require EKPC to pay a price greater than $0 for electric capacity purchased from QFs when EKPC has no need for such capacity.

[Second Amended Petition at 14-15.]

Put another way, EKPC is asking the Court to declare that, "when an electric utility has electric capacity, whether owned and/or contracted for, in an amount that meets or exceeds its load requirements, the utility may not be required to pay more than $0 for electric capacity purchased[.]" [Second Amended Petition at 16]. Regardless of how EKPC's relief is phrased, EKPC ignores the fact that the PSC's implementation of PURPA does not require, as a rule, that a utility pay more than $0 for QF capacity when the utility has excess capacity. The PSC, in its

order implementing PURPA, laid out the steps through which a utility must go, including providing the PSC sufficient evidence of the facts averred, to pay $0 for QF capacity.

A state commission may implement PURPA "by issuing regulations, resolving disputes on a case-by-case basis, or by adopting any other means that *reasonably* give effect to FERC's regulations." *FERC v. Mississippi*, 456 U.S. 742, 750 (1982). (Emphasis added). The PSC accomplishes this by promulgating 807 KAR 5:054 as well as by administrative orders in proceedings before it. Consistent with the implementation of PURPA, and with regard to avoided capacity costs, the PSC's 1984 Order implementing PURPA requirements held:

> The commission views the calculation or determination of capacity purchase rates as consisting of three separate steps. The first step is the determination of the conditions under which the electric utilities would be required to make a capacity payment to QFs. The commission is of the opinion that capacity payments are appropriate in most circumstances if the QF meets the reliability and dispatchability criteria which a utility would use for its own generation plant. *There are unique conditions on a utility's system which may obviate the necessity for capacity payments.* If a utility demonstrates to the commission's satisfaction that it simultaneously faces insignificant load growth, excess capacity, minimum off system sales and is neither planning nor constructing capacity within its ten-year planning horizon then the utility cannot avoid capacity-related costs at that time so a capacity payment would not be justified. However, the commission emphasizes that it would be contradictory for utilities to argue for zero avoided capacity costs while proceeding to plan for or construct generating facilities. *The burden is on the utility to demonstrate zero avoided capacity costs.*[6]

Thus, under the PSC's rules and regulations whether a utility pays $0 for QF capacity is a <u>factual</u> issue, unique to each utility. EKPC's quibble with the PSC's regulations is not that the regulations do not allow for a utility to pay $0 for QF capacity (they do) but that EKPC does not want to go through the process of making such a showing. Instead EKPC is relying upon the Court to make a quite sweeping pronouncement that, once a utility (and not a regulatory body)

---

[6] PSC Case No. 8566, *Re Small Power Producers and Cogenerators*, 60 P.U.R.4th 574, 577–78 (June 28, 1984). (1984 WL 1022161). (Emphasis added).

determines the utility has excess capacity to meet its load requirements, it no longer has an obligation to provide payment for QF capacity. Notably, EKPC does not state who determines what EKPC's load requirements are.

It is the PSC and not PJM (or a court) that holds a utility accountable to its load requirements. Kentucky, as discussed *supra*, is a vertically integrated, non-restructured state, wherein the PSC ensures through rate and service regulation that its jurisdictional utilities have sufficient resource adequacy to meet the needs of each individual utility. The Federal Power Act leaves to states jurisdiction over decisions regarding generation and Kentucky has not relinquished its role in ensuring resource adequacy to an RTO, and thus PURPA does not affect or alter the PSC's jurisdiction to determine if a utility's generation capacity and mix meets the requirements necessary for that utility to provide adequate, efficient and affordable service. *See* KRS 278.030(2) ("Every utility shall furnish adequate, efficient and reasonable service, and may establish reasonable rules governing the conduct of its business and the conditions under which it shall be required to render service.")

The PSC, acting within its jurisdiction, does not allow a utility to depend on capacity markets, such as PJM's BRA or incremental auctions, to meet the long-term generation needs of that utility. Neither PURPA nor the FERC mandate this result. Because the PSC expects utilities in Kentucky to have satisfactory generating capacity to serve their native, retail demands, the capacity costs Kentucky utilities are avoiding are not necessarily capacity market clearing prices.

EKPC criticizes the Kentucky administrative regulations and orders regarding PURPA, specifically that, they, "do not limit the price that a purchasing electric utility must pay to a QF to no more than the utility's avoided cost, nor do the Kentucky PSC's PURPA implementation regulations limit the utility's avoided capacity price to $0 when the utility does not need any

capacity." [Second Amended Petition at 11]. This allegation ignores the PSC's Order in Case No. 8566, which set out the PSC's implementation of PURPA's requirements, and which explained the sequential steps in its process for determining the rate for avoided capacity. Case No. 8566 also emphasized the burden on utilities to sufficiently demonstrate to the PSC that a zero-dollar avoided cost rate is in fact justified, including a consideration of whether the utility planned for new generation resources in the next ten years in any calculation of whether excess capacity exists. Taking the regulations and Case No. 8566 together, the PSC's implementation of PURPA does not require EKPC to pay more than PURPA mandates. Rather, the PSC's determination of appropriate PURPA rates first involves a fact specific inquiry and findings regarding the utility's capacity position (i.e., whether it has sufficient capacity to meet its native load), which may then be followed by the determination of any avoided cost rate if so justified. In lieu of this process playing out in a specific case, EKPC seeks an order from this Court to mandate the PSC create a regulation specific to EKPC's preferred end result.

The PSC's orders and regulations implementing PURPA require a fact and utility specific inquiry and determination for situations that would "obviate the necessity for capacity payments." Whether a utility has a defined capacity need can only be made through a finding by the PSC—a utility cannot determine this on its own. Each utility has the burden to prove that the conditions of its system, i.e., the amount and nature of capacity, would not allow for the avoidance of capacity costs in order to be relieved from the obligation to make capacity payments. Because such a determination is a utility-specific determination, and affects only the utility involved, any challenge is an "as applied" challenge that must be brought in Franklin Circuit Court. (PURPA section 210(g) (16 U.S.C. § 824a)). Accordingly, this Court does not have subject matter jurisdiction over EKPC's petition.

**B.      The Court Does Not Have Jurisdiction to Set Ratemaking Methodologies.**

Neither PURPA nor the FERC's order or rules dictate that a particular methodology be used when calculating "avoided costs."  PURPA and the FERC policy provide states the flexibility to calculate a utility's avoided rate cost.  In FERC Order No. 872, the FERC emphasized its continued reliance on flexible implementation of PURPA stating "[s]ince its inception, the Commission's PURPA Regulations have established rules and defined boundaries allowing states flexibility within those boundaries in implementing PURPA as appropriate for each state.  As commenters noted, this allows states to address their unique circumstances and best address each states' needs."  *Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies* Act of 1978, Order No. 872, 172 FERC ¶ 61,041, P 690 (2020). The FERC has approved multiple methodologies set forth by states which as *per se* reasonable for calculating a utility's avoided cost, inter alia, the proxy resource method, the peaker unit method, the partial displacement differential revenue requirement, the IRP based avoided cost methodology, market based pricing, and competitive bidding.[7] FERC recently finalized changes to its PURPA regulations in a Final Rule which addressed certain aspects in calculating avoided cost, especially competitive market prices for avoided energy cost, including locational marginal pricing in organized markets, although this is now only a rebuttable presumption that it is an appropriate means to determine avoided cost; in other markets, market hub prices and formulas based on natural gas prices can serve as a way of calculating avoided energy costs.  Order No. 872 at P 59, P 152. States can also use a competitive solicitation process which conforms with the

---

[7] *See* Carolyn Elefant, Reviving PURPA's Purpose: The Limits of Existing State Avoided Cost Ratemaking Methodologies In Supporting Alternative Energy Development and a Proposed Path for Reform, at 23-28, undated manuscript, available at: http://www.recycled-energy.com/images/uploads/Reviving-PURPA.pdf, ; Carolyn Elefant, Avoided Cost Ratemaking Methodologies Under the Public Utilities Regulatory Policies Act (PURPA), at 12, December 2015, available at https://www.michigan.gov/-/media/Project/Websites/mpsc/workgroups/purpa/LOCEPURPAPPT2182014.pdf?rev=2f10f12f256f42d0b87b3d37d613babc.

Commission's previously delineated minimum transparency and non-discriminatory standards to determine both avoided energy and capacity costs. *Id*. at P 60, P 83.

The FERC, in amending Order No. 872, further clarified that it was not imposing a particular methodology, "[r]egarding QF rates, the final rule provides states further flexibility to better enable states to implement PURPA's statutory obligation that QF rates not exceed the purchasing electric utility's avoided costs." *Qualifying Facility Rates and Requirements Implementation Issues Under the Public Utility Regulatory Policies Act of 1978*, Order No. 872A, 173 FERC ¶ 61,158, 61,955 P. 41 (2020). The FERC further noted that the amended order, "granted states the flexibility to choose to adopt one or more of these options or to continue setting QF rates under the standards long established in the PURPA Regulations." *Id.* at 61,951, P 15. Nowhere in PURPA or the FERC's rules and orders is there a preference for or requirement to use newly adopted *per se* or rebuttable reasonable avoided cost calculations based on capacity market prices such as EKPC asserts this Court should dictate the PSC adopt. In particular, the FERC maintained the requirement that, "QFs be given the option to receive avoided capacity costs at fixed rates." *Solar Energy Industries Association*, ---F.4th--- 2023 WL 5691711, at *6 *citing* Order 872, 85 Fed. Reg. at 54,648. Setting avoided capacity rates based upon incremental auctions would render this mandate untenable to QFs.

In short, because PURPA does not impose a particular methodology be used in calculating "avoided costs," PURPA does not empower the Court to impose such a mandate. EKPC's request that the Court do so, therefore, states a claim upon which no relief may be granted.

EKPC requests that the Court endeavor into ratemaking by mandating the PSC adopt EKPC's preferred methodology of calculating avoided costs. While doing so, the Court would also effectively condone that participating in the capacity market is the proper way for EKPC to

obtain generating capacity to meet its generating and capacity needs. Put differently, EKPC is requesting that the Court supplant the judgment of the PSC in determining the appropriateness of the type of generating capacity that EKPC should acquire if it needs to acquire generation capacity. No provision in federal law, especially PURPA, grants courts the jurisdiction to make such a determination. Because PURPA does not allow the Court to grant the relief that EKPC requests, EKPC fails to state a claim upon which relief may be granted.

EKPC, however, is requesting that the Court declare <u>how</u> the PSC is to determine avoided capacity costs. EKPC requests that the Court declare that "an electric utility's avoided cost rate for capacity may be determined by reference to capacity that is or will be purchased by the electric utility." [Second Amended Petition at 16]. EKPC further requests that the Court declare, "that the market-clearing price in an organized capacity market auction in which an electric utility acquires capacity to meet its load-serving obligations, or to replace capacity resource commitments if it had sufficient owned and/or contracted resources to meet its load-serving obligations, may be an appropriate measure of the electric utility's incremental cost of capacity" [Second Amended Petition at 16].

These two requests for relief are not based upon any alleged violation of PURPA or orders from the FERC, and thus, are not properly before the Court as an "as-implemented" challenge. The requested relief explicitly requests the Court declare what are appropriate costs to determine avoided capacity costs—which sounds a lot like ratemaking. If anything, this underscores the fact that EKPC's action is an "as-applied" challenge as requesting that the Court declare using capacity

auctions to determine avoided capacity costs is precisely what EKPC requested, and the PSC rejected, in EKPC's tariff case setting QF rates.[8]

Should EKPC believe the PSC determines the utility's avoided costs and QF purchase rates at amounts contrary to PURPA, their relief sits with Franklin Circuit Court, not here.

## C. *Burford* Abstention is Appropriate.

Assuming, *arguendo,* that the Court concludes that it has jurisdiction to entertain EKPC's case as an "as implemented" challenge, or that EKPC has made sufficient claims upon which relief may be granted, the PSC respectfully suggests that that the *Burford* Doctrine counsels in favor of the Court abstaining from ruling on and dismissing EKPC's petition in this case as the underlying question involves state agency application of state laws and regulations. *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S. Ct. 1098, 87 L. Ed. 1424 (1943). The Supreme Court has distilled the *Burford* Doctrine as follows:

> Where timely and adequate state-court review is available, a federal court sitting in equity must decline to interfere with the proceedings or orders of state administrative agencies: (1) when there are difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case the at bar; or (2) where the exercise of federal review of the question in a case and in similar cases would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern.

*NOPSI*, 491 U.S. at 361.

EKPC, since initiating the current proceeding with the Court, has filed with the PSC tariff sheets containing proposed QF rates.[9] The PSC, under state law, has suspended those rates for investigation and, under state law, must issue an order on or before October 31, 2023, or the rates

---

[8] *See*, *In the Matter of: Electronic Tariff Filing of East Kentucky Power Cooperative, Inc. and Its Member Distribution Cooperatives for Approval of Proposed Changes to Their Qualified Cogeneration and Small Power Production Facilities Tariffs*, 2021-00198, 2021 WL 5052843 (Oct. 26, 2021).

[9] The proposed tariff sheets of EKPC and accompanying documents are attached as Exhibit F.

go into effect as proposed. A hearing in that matter was scheduled for September 15, 2023, the PSC, however, cancelled the hearing and the matter is now submitted for a decision.

EKPC and its member cooperatives, unlike in the most recent QF proceeding Case No. 2021-00198, are now proposing that QF capacity rates be $0. *See* Exhibit F at 1, ("EKPC does not need capacity during the PURPA horizon, and, therefore, its avoided capacity rate for both dispatchable and non-dispatchable Small Power Production and cogeneration facilities is $0.") (Footnote omitted). Thus, EKPC's proposed QF rate could be directly affected by EKPC's requested declaratory relief from this Court. Part of the PSC's inquiry in the current proceedings is to determine if EKPC does not have current or projected capacity needs required to meet its obligations to its native load – which requires a fact specific review of the manner, capacity, and type of EKPC's generation mix as well as projected load growth. Determining the sufficiency of capacity to meet a utility's native load obligation is a role left to the state under the Federal Power Act and is a policy decision of "substantial public import." Here, EKPC is requesting that the Court declare:

> [U]nder PURPA Section 210(a) that, when an electric utility has electric capacity, whether owned and/or contracted for, in an amount that meets or exceeds its load requirements, the utility may not be required to pay more than $0 for electric capacity purchased from QFs.

[Second Amended Petition at 16].

There are few things more important under the PSC's jurisdiction than its regulation of utilities' reliability and ensuring those utilities provide adequate service through sufficient generating capacity. The practical effect of the Court granting EKPC's relief is that the Court would not only prejudge an issue that is currently before the PSC, but that it would make a declaration that a utility could meet or exceed its load obligations through generation "whether owned and/or contracted for," i.e. through membership and participation in an RTO such as

EKPC's membership in PJM. Not all generation is created equal – contracted for generation could potentially include less reliable generators whose generation capacity would count towards a utility's load obligation, but whose reliability or "dispatchability" would not provide sufficiently reliable generation to meet a utility's native load obligation. Granting EKPC's requested declaratory and injunctive relief would strip the PSC of its ability to make the obvious inquiry of whether the owned or contracted generation of any utility participating in an RTO is sufficient to meet, among other things, the capacity and reliability necessary to provide adequate, efficient and reasonable service in Kentucky. *See*, generally, KRS 278.030 and KRS 278.040.

Determining the adequacy of a utility's generation certainly presents, "difficult questions of state law bearing on policy problems of substantial public import[.]" *NOPSI* U.S. 491 at *361*. Even though federal law may dictate the maximum value of QF rates when there is adequate generation, the PSC gets to determine whether there is adequate service through sufficient generation in the first place under state law. *See generally*, PSC Case No. 8566, *Re Small Power Producers and Cogenerators*, 60 P.U.R.4th 574, 577–78 (June 28, 1984). (1984 WL 1022161) and KRS Chapter 278. The requested declaratory and injunctive relief will directly affect and impede the PSC's resolution of policy problems of substantial public import such that the Court should appropriately abstain from acting on EKPC's Second Amended Petition and dismiss this action.

The PSC's determination regarding adequate service through generation sufficiency is also made in the furtherance of establishing or reinforcing its policy that a utility may not meet its native load obligations by relying on a capacity market such as PJM. The Court's exercise of its review of the overlapping questions presented in EKPC's Second Amended Petition and in EKPC's pending tariff review at the PSC, "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern[.]" *NOPSI* 491 U.S. at 361.

If the Court were to grant EKPC's declaratory and injunctive relief, it would prejudge and frustrate the PSC's efforts to establish a coherent policy regarding substantial public concern.

Federal precedent counsels in favor of this Court abstaining, and thereby not impeding the PSC's express authority to regulate Kentucky's utilities and set fair, just and reasonable rates. *See e.g. Prentis v. Atlantic Coast Line Co.*, 211 U.S. 210, 29 S. Ct. 67, 53 L. Ed. 150 (1908). In *Prentis* the Supreme Court found abstention by a federal court in a Virginia railroad ratemaking proceeding appropriate because Virginia had provided for legislative review of commission rates by appeal to the state courts and that the challenging railroad "should make sure that the State in its final legislative action would not respect what they think their rights to be, before resorting to the courts of the United States." *Id.,* at 230, 29 S.Ct., at 71.

Likewise, in *Coalition for Health Concern v. LWD, Inc.*, the 6th Circuit found that *Burford* abstention was appropriate in a case involving the licensing and operation of a hazardous waste incineration facility in Kentucky. 60 F.3d 1188, 1189 (6th Cir. 1995). Notably, the hazardous waste scheme implemented by Kentucky was based on the Resource Conservation and Recovery Act ("RCRA"), which is a "comprehensive regulatory system designed to promote the safe handling of solid and hazardous wastes." *Id.* at 1190. Following passage of the RCRA, Kentucky implemented its own hazardous waste disposal program and received authorization from the Environmental Protection Agency to implement it. *Id.* When the plaintiff-appellees failed to convince the Kentucky agency that the incineration facility violated Federal law, they abandoned the available Kentucky administrative process and proceeded straight to Federal district court. *Id.*

The Court in *Coalition for Health Concern* reasoned that *Burford* abstention required the district court to decline to interfere in the state proceeding because: (1) "Kentucky has an overriding interest in the protection of its environment from the unregulated hazardous waste as

indicated by its enactment of a broad statutory scheme and review process[;]" (2) that "the exercise of federal review at [the current] juncture would be disruptive of Kentucky's efforts to establish a coherent policy with respect to the licensing of hazardous waste facilities[;]" and (3) that the plaintiffs' claims "do not and cannot arise in isolation from state law issues nor are they premised solely on alleged violations of federal law. Each of plaintiffs' remaining . . . claims seeks declaratory and injunctive relief for alleged violations of *state* and federal RCRA requirements." *Id.* at 1194 (emphasis original). EKPC's position in this case is indistinguishable. There is no dispute that the PSC has the authority to regulate utilities and set rates under state law. Indeed, rate setting and regulation is an overriding public concern of the Commonwealth as it directly affects each of its citizens, and the existence and history of the PSC clearly shows a deliberate effort by the Commonwealth to establish a coherent policy, and finally, the problem at hand cannot be extricated so that the federal and state statutory questions are entirely divorced from one another.

Moreover, EKPC is not without redress should it disagree with the PSC's final Order in the pending tariff case. EKPC has a statutory right to bring an as-applied challenge to the Order in state court, particularly Franklin Circuit Court. Kentucky's General Assembly has provided that a party to a PSC Order may bring review of the order pursuant to KRS 278.410(1), which provides, in part, that a party may "bring an action against the commission in the Franklin Circuit Court to vacate or set aside the order or determination on the ground that it is unlawful or unreasonable." An order is unlawful if it violates a state or federal statute or constitutional provision. *National-Southwire Aluminum Co. v. Big Rivers Elec. Corp.,* 785 S.W.2d 503, 510 (Ky. App. 1990). An order is unreasonable "only when it is determined that the evidence presented leaves no room for difference of opinion among reasonable minds." *Energy Regulatory Comm'n*

*v. Kentucky Power Co.,* 605 S.W.2d 46, 50 (Ky. App. 1980) citing *Thurman v. Meridian Mut. Ins. Co.,* 345 S.W.2d 635 (Ky. 1961). A party challenging a PSC order has the burden of proof to show by clear and satisfactory evidence that the order is unlawful or unreasonable. KRS 278.430.

Therefore, should EKPC disagree with a PSC conclusion regarding generation capacity, it could argue that the evidence does not support the PSC's conclusion and assert the conclusion is unreasonable. State law also allows for the Franklin Circuit Court to reverse the PSC if the PSC's order violates a federal statute. *See*, *National-Southwire Aluminum Co.* 785 S.W.2d at 510. ("To be held unlawful, the order must violate a state or federal statute[.]"). Therefore, EKPC is entitled to raise any alleged PSC violation of PURPA in setting QF rates in Franklin Circuit Court. Should the circuit court conclude that the PSC did violate PURPA it can vacate the PSC order and remand to the PSC. KRS 278.450. Thus, EKPC is protected from any alleged PSC violation of PURPA.

## IV. CONCLUSION

The Court, for the reasons put forth above, should grant the Defendants' motion to dismiss.

*/s/John E. B. Pinney*
John E.B. Pinney (Bar # 88031)
Justin M. McNeil (Bar # 95056)
Kentucky Public Service Commission
211 Sower Blvd.
P.O. Box 615
Frankfort, Kentucky 40602
Jeb.pinney@ky.gov
Justin.mcneil@ky.gov
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that the above document was filed on September 26, 2023, using the Court's CM/ECF system, which will electronically serve a copy to all counsel of record.

*/s/ John E. B. Pinney*
John E. B. Pinney
*Counsel for Defendants*
